## 66682. BLACKBURN v. BLACKBURN.

DEEN, Presiding Judge.

The case of *Blackburn v. Blackburn,* 249 Ga. 689 (292 SE2d 821) (1982) concerned the dispute over the custody of a minor child between the natural mother, Kathleen Blackburn, and the paternal

grandmother. Finding that the paternal grandmother, who had petitioned for custody, had failed to show by clear and convincing evidence the parental unfitness of the child's mother, the Supreme Court reversed the trial court's award of custody to the grandmother. Mark Blackburn, the child's father, subsequently petitioned for and was awarded custody by the Superior Court of Burke County, from which award the mother appeals.

Mark and Kathleen Blackburn were married on October 31, 1977, in New Haven, Connecticut. In September 1978 they moved to Minnesota to be with the appellant's family during the later stage of her pregnancy. After the birth of Nicholas on December 1, 1978, they relocated to Millen, Georgia, where they resided with the appellee's parents. Shortly thereafter, Kathleen Blackburn was hired as a dietician at the Jenkins County Hospital, earning $175 weekly; approximately 3 months passed before Mark Blackburn obtained employment with the Georgia Power Company at its Plant Vogtle. Up to that point he had worked only sporadically throughout the marriage. The parties separated in late spring 1979 and eventually divorced on July 17, 1979, with Kathleen Blackburn being awarded custody of Nicholas and Mark Blackburn being ordered to pay $35 weekly child support.

Following the divorce Mark Blackburn continued to reside with his parents and to work for Georgia Power Company. His work record was excellent, resulting in his selection as employee of the month on one occasion. Sometime in 1980 he joined an electrical union and enrolled in its 4-year apprentice program, which featured a pay raise every 6 months upon his satisfactory completion of the educational and training requirements. At the time of the trial, his salary was $8.00 per hour, with an ultimate, forecasted salary of $13.35 per hour. He also was selected the most outstanding student of his class for 2 consecutive years.

Mark Blackburn's past was not uncheckered. In 1977 he was convicted of simple battery in Connecticut. Around the time of the divorce in 1979, he was arrested for theft by taking automobile tires, although the victim declined to prosecute after restitution was made. (Kathleen Blackburn was with the appellee at the time of the arrest, and, ironically, the arresting officer, Gene Wright, ultimately became her paramour and fathered her illegitimate daughter.) Subsequently, apparently in a dejected mood caused by an unsuccessful romance, appellee broke a whiskey bottle over the head of a man he found with his ex-girl friend in a lounge. Charged with 2 counts of aggravated assault, the appellee pleaded guilty and he was sentenced to 1 year probation and restitution for medical expenses. He also received psychiatric treatment following the incident.

In 1980 he moved to Augusta, Georgia, and lived in an apartment for approximately 1 year before marrying his present wife, Marynell. He currently resides in a rented house with his wife and his 16 and 13 year old stepdaughters. His wife also is employed, earning $150 weekly gross wages, and she receives $50 per week in child support. It appears that Mark Blackburn has striven to develop a wholesome family unit by devoting much of his time and attention to the stepchildren. He and his new family have attended church together regularly for the past year.

The appellee regularly exercised his visitation rights while the appellant had custody of Nicholas. He also made the child support payments to the appellant required by the divorce order regularly in 1979, much of 1980, and sporadically in 1981. The appellee's mother, of course, had legal custody of Nicholas from late 1981 until November 1982.

The appellant has changed her residence 7 times since the dissolution of the marriage. Initially she moved in with a co-worker at the Jenkins County Hospital. In August 1979 she rented a mobile home, where she remained for 4 to 5 months until the landlord disconnected the utilities because the appellant had failed to pay any rent for several months. (The landlord testified that upon inspecting the premises approximately 2 weeks following the appellant's removal, he discovered dirty dishes, soiled diapers on the floor, and a large amount of spoiled food in the refrigerator.) The appellant then moved to the Congress Motel to await the opening of the Millen Villa Apartments. She eventually obtained an apartment in Millen Villa and remained there from July 1980 to July 1982. Since July 1982 the appellant has changed residences 3 times, currently living in another rented mobile home. Despite the testimony of the landlord/owner of the previous mobile home, most of the evidence indicated that the appellant maintained adequate housekeeping habits.

The appellant had resigned her job at the hospital prior to moving into the Millen Villa apartment. Her subsequent employment history includes working at a poultry processing plant and her current job managing a record store in Burke County with a net weekly salary of $115.

While residing at the Congress Motel, the appellant was frequently seen in the company of men late at night, often with Nicholas. After her relationship with Gene Wright developed, Wright frequently visited the appellant at her Millen Villa apartment, although these visits were always brief, usually lasting only 15-30 minutes. The two were also seen on a number of occasions behind a Millen public school, hugging each other and lying in the front seat of

a car, in the presence of Nicholas. The appellant never visited Wright's home, and she denied knowing at the time she dated him that he was married. The appellant's pregnancy resulted from this relationship.

The appellant's current paramour, Willie Boyd, has spent the night with her on more than one occasion. On February 23, 1983, approximately 2 weeks before the trial, the Burke County Department of Family and Children Services received a report that Nicholas had been beaten. There was some evidence implicating Boyd in the beating, but the Department of Family and Children Services had not completed its investigation because Boyd, having been recently incarcerated for DUI, speeding, and presenting false identification, had been unavailable to interview. The investigating caseworker did not, however, believe that Nicholas was in any danger and concluded that protective custody was unnecessary. At trial Boyd did admit to having spanked Nicholas on another occasion as punishment for Nicholas's reference to Boyd with a racially derogatory term. Boyd has also fought with and pushed the appellant to the ground in the presence of Nicholas.

When the appellant worked at the Jenkins County Hospital, she had to keep Nicholas with her from 6:30 to 8:00 a.m. because the babysitter would not take the child earlier. During that time the child was left on the dining room floor and not closely supervised. Because there was no playground, Nicholas was also allowed to play in the parking lot of the Millen Villa apartments, although there seems to have been some understanding between the apartment complex residents to take turns watching over the children. The appellant's various child care arrangements while she worked usually were adequate, but on occasion she failed to provide the babysitter with a proper change of clothing for child.

Dr. Virgil Abreu testified that from 1979 until June 1981 he had treated Nicholas for frequent gastrointestinal and respiratory ailments. Dr. Abreu noted that frequent respiratory ailments were common for small children, but he still felt that the frequency suffered by Nicholas was abnormal. In his opinion, being left on the hospital's dining room floor exposed the child to a greater risk of disease; he also believed that consumption of baby formula past the formula's expiration date could have contributed to the child's gastrointestinal problems. Dr. Abreu, noting that Nicholas did not gain a pound from February to June 1981, felt that the child's growth also had not been normal.

The appellant often allowed the appellee's mother to keep the child when he was ill until he recovered. Nicholas also gained 2 pounds between June 26, 1981, and August 13, 1981, after being

placed in the custody of his grandmother.

Shortly before the trial, Nicholas was examined by 2 other pediatricians, Dr. Gerson Avonovitz and Dr. Monica Green. Both physicians found the child healthy with no signs of physical abuse, and neither agreed with the general conclusions of Dr. Abreu.

Since her divorce from the appellee, the appellant, in addition to having an illegitimate child, has had an abortion and, as late as August 1982, been treated for gonorrhea. It does not appear that the appellant has had any other significant medical problems. She underwent a psychiatric examination by Dr. Lloyd Baccus on February 1, 1983, and Dr. Baccus considered her to be emotionally stable and capable of caring for her children. The appellant does not maintain any close ties with her own family.

The trial court concluded that it was in the best interests of the child to place him under the custody of the appellee. On appeal, Kathleen Blackburn contends that the court erred in finding that the appellee had not earlier relinquished his parental power and therefore applied the incorrect legal standard in awarding custody; that the appellee's action was barred by the doctrines of res judicata, estoppel by judgment, or equitable estoppel; and that the trial court erred in failing to compel discovery from the appellee and admitting evidence pertaining to matters as to which discovery had not been provided. *Held:*

1. As between natural parents, a change in custody of a minor child may be awarded only upon a showing of a change in material conditions or circumstances of the parties or the child, subsequent to the original decree of divorce and award of custody, and that the change of custody would be in the best interests of the child. OCGA § 19-9-1 (b) (Code Ann. § 30-127); *Gazaway v. Brackett,* 241 Ga. 127 (244 SE2d 238) (1978); *Crumbley v. Stewart,* 238 Ga. 169 (231 SE2d 772) (1977). Between a third party and a natural parent, however, the parent is entitled to custody unless it is shown by clear and convincing evidence that the parent either has lost the parental right to custody under OCGA §§ 19-7-1 (Code Ann. § 74-108) and 19-7-4 (Code Ann. § 74-109) or is unfit. *Durden v. Barron,* 249 Ga. 686 (290 SE2d 923) (1982); *Blackburn v. Blackburn,* supra.

The appellant contends that the appellee is in the position of a third party rather than a natural parent, because he by voluntary contract released his parental power to his mother when she petitioned for custody of Nicholas. OCGA § 19-7-1 (b) (Code Ann. § 74-108) does provide that parental power may be lost by voluntary contract, but the evidence must establish clear, definite, and unambiguous terms of such a contract before a relinquishment of parental rights will be found. *Shaddrix v. Womack,* 231 Ga. 628 (203

SE2d 225) (1974); *Waldrup v. Crane,* 203 Ga. 388 (46 SE2d 919) (1948); *Beavers v. Williams,* 199 Ga. 113 (33 SE2d 343) (1945).

In this case, the evidence demonstrated merely that the appellee and his family discussed their conviction that the appellant should not have custody of the child, and that, after considering their respective circumstances, all agreed that at that time the paternal grandmother would have the better prospects of successfully petitioning for custody. This evidence simply is insufficient to establish a clear, definite, and unambiguous contractual relinquishment of parental rights.

The appellant emphasizes that appellee's counsel, while representing the appellee's mother in her custody proceeding against the appellant, had asserted that Mark Blackburn had voluntarily waived his parental rights; the appellant contends that the appellee is thus bound by this representation made by his counsel. Generally, a statement before the court by an attorney relating to the conduct of his client is binding on the client, absent a showing of fraud or mistake. *White v. State,* 153 Ga. App. 808 (266 SE2d 528) (1980). This rule is inapplicable in this case, however, where the attorney made the assertion prior to the creation of the attorney/client relationship between the appellee and himself and thus without authority to act on the appellee's behalf. See *McCoy v. McSorley,* 119 Ga. App. 603 (168 SE2d 202) (1969); *Dean v. Jackson,* 219 Ga. 552 (134 SE2d 601) (1964). Accordingly, the trial court properly decided this case as one involving two natural parents.

Where a change of custody has been awarded because of a material change of conditions affecting the welfare of the child, this court will affirm if there is reasonable evidence to support the decision. *Haralson v. Moore,* 237 Ga. 257 (227 SE2d 247) (1976); *Robinson v. Ashmore,* 232 Ga. 498 (207 SE2d 484) (1974); *Gazaway v. Brackett,* supra. We note that the Supreme Court revised the standard of appellate review in custody disputes between a third party and natural parent to " 'whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.' " *Blackburn v. Blackburn,* supra at 694. This court cannot, however, extend that standard of review to cases involving a custody dispute between natural parents.

The evidence adduced below demonstrated a marked maturation of the appellee since the divorce and original custody award on July 17, 1979. His employment record has been outstanding since 1980, and his earning capacity continues to improve. He has developed a wholesome and stable home with his current wife and 2 stepdaughters. The appellee has attempted to provide parental

guidance and care for his stepdaughters and Nicholas. Moreover, the appellee's current wife and stepchildren appear eager to add Nicholas to the family structure.

The appellant has moved a total of 7 times since the divorce, 3 times since July 1982. Her earning capacity has diminished, and her current line of employment offers little prospect for advancement. Since the divorce, the appellant has given birth to an illegitimate child, had one abortion, and contracted gonorrhea. There was sufficient evidence of record to support the trial court's finding that the appellant has carried on meretricious relationships in the presence of Nicholas. The child has also witnessed and been subjected to unnecessary violence by at least one of the appellant's male companions.

The trial court made 3 basic conclusions: 1. that the appellee's circumstances had dramatically improved; 2. that the appellant's circumstances had worsened; and 3. that the appellee presently offered the child material and emotional support superior to that provided by the appellant. These conclusions were certainly supported by reasonable evidence, and the trial court was thus authorized to award custody of the child to the appellee.

2. We reject the appellant's contention that the appellee's petition for custody should have been barred by the doctrines of either res judicata, estoppel by judgment, or equitable estoppel, because of the prior custody proceeding between the appellant and the appellee's mother. Generally, res judicata bars relitigation of any matter of a cause of action that was, or could have been, put in issue and adjudicated in a prior proceeding between the same parties, while estoppel by judgment prevents relitigation in a subsequent suit (involving a different cause of action) a matter which was actually adjudicated in a former case. OCGA § 9-12-40 (Code Ann. § 110-501); *Firestone Tire & Rubber Co. v. Pinyan,* 155 Ga. App. 343 (270 SE2d 883) (1980); *A. R. Hudson Realty v. Hood,* 151 Ga. App. 778 (262 SE2d 189) (1979). Neither defense, however, is available unless the subsequent suit is between the same parties or their privies. *Anderson Oil Co., Inc. v. Benton Oil Co.,* 246 Ga. 304 (271 SE2d 207) (1980); *Firestone Tire & Rubber Co. v. Pinyan,* supra.

In this case, the appellee was not a party to the proceeding between his mother and the appellant, and his parental interest and right to custody of the child were distinct, separate from, and superior to any interest or right asserted by the third party grandmother; the appellee and his mother thus could not be considered privies. Moreover, as discussed above, no privity was established by any contractual waiver of the appellee's parental rights in favor of his mother, and the dispositive issue in a child

custody proceeding differs when a natural parent seeks custody and when a third party so petitions. Accordingly, the trial court correctly held that the appellee's petition was not barred by res judicata or estoppel by judgment resulting from the proceeding between the appellant and the grandmother.

The appellee, of course, was not barred from seeking a modification of the original custody award contained in the divorce decree of July 17, 1979. OCGA § 19-9-1 (b) (Code Ann. § 30-127) expressly authorizes such a petition. See also *Durden v. Barron,* 155 Ga. App. 529 (271 SE2d 667) (1980).

We also find no merit in the appellant's contention that equitable estoppel barred the appellee's petition. "In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury." OCGA § 24-4-27 (Code Ann. § 38-116); *Harris v. Abney,* 208 Ga. 518 (67 SE2d 724) (1951). The appellant imaginatively explains the applicability of equitable estoppel by alleging that the appellee deliberately concealed the encouragement he offered his mother in the prior proceeding, thereby inducing the appellant not to join him as a party in that action. As a matter of law, however, the appellant's argument fails to demonstrate any harm or disadvantage presented by the appellee's absence in the earlier case, and injury is essential for an equitable estoppel. *City of Atlanta v. Anglin,* 209 Ga. 170 (71 SE2d 419) (1952). The appellee could not be classified as an indispensable party to the prior proceeding, and we know of no duty of a noncustodial parent to intervene in a child custody dispute between a third party and the custodial parent. No equitable estoppel thus arose from the appellee's nonjoinder in the proceeding between his mother and the appellant.

3. The appellant further asserts that the trial court erred in refusing to apply sanctions for the appellee's failure to produce and then admitting into evidence certain cancelled checks endorsed by the appellant, medical records concerning the appellant, and a photograph. At trial, however, the appellant waived any objection to the admission of the cancelled checks by failing to object, and this court will not address the appellant's argument regarding the admission of the medical records since the exception made presently on appeal differs from that made at trial. *Argonaut Ins. Co. v. Head,* 149 Ga. App. 528 (254 SE2d 747) (1979). Concerning the photograph, the record does not indicate any actual noncompliance with the appellant's discovery request, since counsel for the appellee obtained the photograph only shortly before the trial, and thus sanctions were

inappropriate.

The appellant also contends that the trial court should have compelled the appellee and appellee's witnesses to answer certain questions raised on deposition, most of which concerned any pre-marital sexual activity between the appellee and his current wife. The trial court did not order a pre-trial response to these questions, but, contrary to the appellant's assertion, it did not foreclose any questioning on that matter at trial. At the trial's beginning, the court, in fact, intimated its determination that such a line of questioning was relevant and that it would require answers from the witnesses. The appellant, however, did not pursue that matter at trial and may not here complain of the omission at the discovery level.

*Judgment affirmed. Banke and Carley, JJ., concur.*

DECIDED SEPTEMBER 6, 1983 —
REHEARING DENIED SEPTEMBER 21, 1983 — ▮▮▮▮▮▮▮

*Ozell Hudson, Jr., John H. Ruffin, Jr., John L. Cromartie, Jr., William J. Cobb, Mary R. Carden,* for appellant.
*R. Simmons Lanier,* for appellee.